```
                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF NEW HAMPSHIRE


Peterboro Tool Co., Inc. Profit
Sharing Plan & Trust

     v.                                   Case No. 11-cv-437-PB
                                          Opinion No. 2012 DNH 026
People's United Bank, Successor in
Interest to Flagship Bank & Trust
```

### MEMORANDUM AND ORDER

Between 2007 and 2009, the fiduciary for the Peterboro Tool Co, Inc. Profit Sharing Plan and Trust ("the Plan") stole nearly $250,000 from the Plan's money market account at People's United Bank, successor in interest to Flagship Bank and Trust (collectively "the Bank"). The Plan brings suit against the Bank, asserting that the Bank should have detected its fiduciary's suspicious withdrawals and protected its funds from misappropriation. The Plan argues that the Bank is liable for (1) negligence; (2) breach of fiduciary duty; and (3) breach of a bailment agreement. The Bank moves to dismiss all claims, and for the reasons provided below, I grant the Bank's motion.

I.   **BACKGROUND**

**A.   Facts**

In 1970, Peterboro Tool Company, Inc. ("the Company") established the Plan as a non-contributory profit-sharing plan for the benefit of its employees. Since 1996, the Plan has held assets in a money market account and several certificates of deposit at the Bank. For the relevant time period, Bernard R. Mullan was the Plan's fiduciary as well as the accountant for the Company and the Plan. In his capacity as fiduciary, Mullan had access to and signatory power over Plan assets, including bank accounts.

In a series of thefts dating as far back as 1992, Mullan misappropriated the Plan's funds for his personal use. The Plan estimates that it has lost $634,467 in total. At issue in this case is Mullan's theft of approximately $249,900 from the Plan's money market account with the Bank.

Between October 15, 2007 and November 2, 2009, Mullan made 23 separate withdrawals from the money market account, ranging in size from $1,000 to $40,000. He made one withdrawal in late

2

2007, four withdrawals in late 2008,[1] and the remaining 18 withdrawals between June 29 and November 2, 2009. As with his prior thefts, Mullan concealed these 23 illicit withdrawals from the Company and the Plan by entering fraudulent information on the Plan's books.[2] He recorded the withdrawals as transfers to a non-existent account at another financial institution. Mullan buttressed the illusion by making annual entries listing the additional interest that had accrued on the fictitious account, and he would list the account's value as having increased accordingly. The Plan finally discovered that Mullan had looted its funds in November 2009, when it replaced Mullan as fiduciary and investigated its assets.

The Plan asserts that the Bank knew that Mullan was the Plan's fiduciary. It also draws attention to the particular manner in which two of Mullan's withdrawals were made. On July 10, 2009, Mullan withdrew $40,000 from the Plan's account, taking $8,000 in cash and placing $32,000 into his own personal

---

[1] The Plan asserts an additional withdrawal of $2,000 in mid-August 2008 that was repaid by Mullan and so has not been included among the 23 enumerated withdrawals.

[2] By the time his thefts were discovered, it appears that Mullan had not finished creating fraudulent entries to conceal his more recent withdrawals.

3

account at the Bank.  Ten days later, Mullan withdrew $10,000 from the Plan's account, taking half in cash and placing the other half into the same personal account.  The Plan indicates that other transactions were conducted in a similar manner, asserting that it is prepared to amend its pleading to "include elaborate details . . . regarding how much of each withdrawal was cash and how much was deposited into Mr. Mullan's account at the Bank."  Obj. to Mot. to Dismiss at 12 n.6, Doc. No. 7-1.

**B.   Procedural History**

On November 12, 2009, the Company (acting on behalf of the Plan) brought suit against Mullan, and obtained an attachment in the amount of $225,000.  Subsequently, Mullan filed for bankruptcy.

On August 2, 2011, the Plan filed suit against the Bank in New Hampshire Superior Court.  Invoking this court's diversity jurisdiction, the Bank removed the case to federal court on September 15, 2011.

## II.   STANDARD OF REVIEW

In considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), I "accept as true the well-pleaded

4

factual allegations of the complaint, draw all reasonable inferences therefrom in the plaintiff's favor and determine whether the complaint, so read, sets forth facts sufficient to justify recovery on any cognizable theory." Martin v. Applied Cellular Tech., 284 F.3d 1, 6 (1st Cir. 2002).  To survive a motion to dismiss for failure to state a claim, the general standard under Rule 8 of the Federal Rules of Civil Procedure is that the complaint must "state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when it pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  Id. (citations omitted).

### III.  ANALYSIS

The Plan brings claims against the Bank for negligence, breach of fiduciary duty, and breach of a bailment agreement.

The Plan asserts that the Bank should have notified it of Mullan's transactions (and/or taken other protective steps) prior to late 2009 because a reasonably prudent bank should have been aware, in light of the suspicious circumstances surrounding the withdrawals, that Mullan may have been breaching his fiduciary duty to the Plan.  Compl. ¶ 39, Doc. No. 1-1. Additionally, the Plan faults the Bank for "failing to establish, maintain, update and follow internal procedures" that would have more quickly revealed Mullan's unauthorized conduct. Id. ¶ 44.

**A.    Negligence**

    1.   Special Relationship

The Plan claims that the Bank's negligence in disbursing funds to Mullan breached a duty of care that it owed to the Plan.  The Bank, relying on Ahrendt v. Granite Bank, 144 N.H. 308 (1999), contends that it had no duty to protect the Plan from the fraudulent conduct of a third party.  I agree with the Bank that Ahrendt is controlling on the facts of this case.

To prevail on a claim for negligence, a plaintiff must show that the defendant breached a duty of care that it owed to the plaintiff and that the breach proximately caused the plaintiff's

6

claimed injury.  Carignan v. N.H. Int'l Speedway, Inc., 151 N.H. 409, 413 (2004).  The existence of a duty is a question of law. Id.  In New Hampshire, the general rule is that an individual has no duty to protect another from the criminal acts of third parties.  See Marquay v. Eno, 139 N.H. 708, 716 (1995); Walls v. Oxford Mgmt. Co., 137 N.H. 653, 656 (1993).  A duty may arise, however, if a special relationship exists.  Marquay, 139 N.H. at 716.

In Ahrendt, the court considered whether a bank has the requisite special relationship with a depositor.  144 N.H. at 314.  In that case, the eighty-year-old plaintiff signed handwritten notes stating that she authorized a bank to disburse nearly $50,000 from her money market account to a man who had carried out repairs at her home.  Id. at 309-10.  Bearing the notes, the man came in person to the bank four times, making a withdrawal exceeding $10,000 on each visit.  Id.  The employee who processed the first transaction noted that she felt "uncomfortable" about the situation, but wrote out a bank check after verifying the plaintiff's signature and calling her to confirm her intent.  Id. at 310.  For two of the other three withdrawals, the bank verified the plaintiff's signature and

called to confirm the transaction. Id. Shortly after the fourth transaction, the plaintiff's family discovered that the man had been cheating the plaintiff. Id.

The plaintiff sued the bank, alleging that its agents should have known that the man was exploiting her, and that it had failed to exercise due care to protect her. Id. at 314. The court ruled in favor of the bank on the basis that it did not owe the plaintiff a duty: "We decline to hold that the relationship between a bank and its customer, under the facts of this case, gives rise to a special duty to protect the customer from the fraudulent conduct of third parties that the law would not otherwise impose." Id.[3]

The Plan has failed to identify any material dissimilarity between the circumstances of this case and the circumstances in

---

[3] Courts in other jurisdictions have reached different conclusions, and I do not speak to the ultimate wisdom of the decision in Ahrendt. See, e.g., Mut. Serv. Cas. Ins. Co. v. Elizabeth State Bank, 265 F.3d 601, 618 (7th Cir. 2001) ("[A] bank's failure to observe ordinary care in handling its customer's transactions may support a tort claim[.]"); Norwest Mortgage, Inc. v. Dime Sav. Bank of N.Y., 721 N.Y.S.2d 94, 95 (App. Div. 2d Dept. 2001) ("Facts sufficient to cause a reasonably prudent person to suspect that trust funds are being misappropriated will trigger a duty of inquiry on the part of a depositary bank[.]"). I do note, however, that Ahrendt unequivocally states the current law in New Hampshire and that the Plan has not alleged that the law of any other jurisdiction should be applied to this case.

Ahrendt.  The Plan's relationship with the Bank was the same typical bank-depositor relationship present in Ahrendt; none of the facts alleged tend to show any additional facets of the relationship that might otherwise bring it within the category of a special relationship.  Moreover, the factual allegation at the heart of both claims is the same: an agent of the depositor defrauded the depositor while acting within the scope of his apparent authority.  Ahrendt makes clear that a bank ordinarily has no duty to protect a depositor from the unauthorized acts of its agent under such circumstances.  144 N.H. at 314.

    2.   Alternative Theories for Imposing a Duty

The Plan offers two alternative theories as to why a duty should be imposed.  Both are unavailing.

The Plan asserts that the Bank voluntarily assumed a duty to protect its assets against fraudsters because the Bank established internal fraud-prevention procedures, albeit measures that turned out to be inadequate.  Pl.'s Obj. to Mot. to Dismiss at 8-9, Doc. No. 7-1.  Although it is often true that "one who voluntarily assumes a duty thereafter has a duty to act with reasonable care," Walls, 137 N.H. at 659, the Plan's attempt to apply the doctrine to this case is unpersuasive.

First, despite specifically noting certain security and verification procedures taken by the bank in Ahrendt, the New Hampshire Supreme Court held that the bank nevertheless had no duty to protect its depositor from fraud.  144 N.H. at 310, 314. Second, the Plan has not alleged with particularity any special procedures not mandated by federal banking regulations that could justify a duty based on voluntary assumption.[4]

The next alternative theory is that a duty arose because the Bank had constructive knowledge of Mullan's fraud.[5]  The Plan relies on a number of decisions from the state courts of New York for the proposition that when a reasonably prudent person knows or should know that funds are about to be misappropriated, a duty arises to make reasonable inquiry to ascertain the true facts before permitting a withdrawal.  Pl.'s Obj. to Mot. to Dismiss at 10-13, Doc. No. 4-1 (citing Diamore Realty Corp. v. Stern, 855 N.Y.S.2d 206, 207-08 (App. Div. 2d Dept. 2008); In re

---

[4] Because certain fraud detection and prevention measures are mandated by the federal regulatory regime concerning banks, it cannot be that a bank that complies with required procedures loses the benefit of Ahrendt and "voluntarily" assumes a duty that it does not otherwise owe to its depositors.

[5] Although the Plan frames its argument as based on the Bank's "actual or constructive knowledge," the Bank does not allege any facts that suggest actual knowledge.  See Obj. to Mot. to Dismiss at 10, Doc. No. 7-1.

Bohenko's Estate, 3 N.Y.S. 420, 423-24 (App. Div. 4th Dept. 1938); Ben Soep Co., Inc. v. Highgate Hall of Orange Cnty. Inc., 535 N.Y.S.2d 1018, 1021 (Sup. Ct. 1988)). Regardless of whether the Plan has sufficiently pled facts showing that the Bank could be liable under New York law on the basis of its constructive knowledge of Mullan's misappropriation, a theory of liability premised on constructive knowledge is foreclosed in New Hampshire by Ahrendt.

**B.   Breach of Fiduciary Duty**

The Plan contends that it had a fiduciary relationship with the Bank and that the Bank breached its fiduciary duty. The Bank responds that its relationship with the Plan was not a fiduciary one. I agree with the Bank.

A fiduciary relationship is a "comprehensive term and exists wherever influence has been acquired and abused or confidence has been reposed and betrayed." Lash v. Cheshire Cnty. Sav. Bank, 124 N.H. 435, 438 (1984) (per curiam) (quoting Cornwell v. Cornwell, 116 N.H. 205, 209 (1976)). "As a general rule, the relationship between a bank and a customer is not a fiduciary one unless the law otherwise specifies." Ahrendt, 144 N.H. at 311. The relationship between an ordinary depositor and

a bank is contractual in nature and does not create fiduciary obligations.  Id. at 311-12.

In this case, the Plan asserts that the suspicious nature of Mullan's transactions gave rise to a fiduciary duty by the Bank.  Without more, however, an authorized agent's suspicious withdrawals from a bank account do not give rise to a fiduciary relationship between the bank and its depositor.  Id.  Ahrendt addressed precisely that situation, and found that no fiduciary obligations existed.  Id.  Furthermore, the cases where a bank was found to have a fiduciary duty to a customer all involved particular relationships of trust or confidence that have no parallels to the facts of this case.  See, e.g., Appeal of Concerned Corporators of Portsmouth Sav. Bank, 129 N.H. 183, 205-06 (trustees of mutual savings banks owe fiduciary obligations to prudently invest depositors' funds); Murphy v. Fin. Dev. Corp., 126 N.H. 536, 541 (1985) (bank acting as mortgagee had fiduciary duty to obtain fair and reasonable price under the circumstances for mortgagor); Lash, 124 N.H. at 437-39 (bank had fiduciary duty where customers obtained loan from bank and bank disbursed loan to third-party creditor of customers without customer authorization).

12

The Plan posits an additional argument in favor of the existence of a fiduciary duty by drawing attention to the court's statement in Ahrendt that "[a] fiduciary relationship . . . can arise under certain facts if equity so requires." 144 N.H. at 311. Taking this statement to mean that a fiduciary duty can arise simply out of a weighing of equitable considerations, the Plan regurgitates the basic facts of the case and asserts that "it would be inequitable to hold that the Bank has no duty to [the Plan] to prevent . . . such a blatant misappropriation." Pl.'s Surreply at 5, Doc. No. 15. The Plan fails, however, to satisfactorily explain why equity requires an outcome in this case that it did not require in Ahrendt, and fails to point to any facts that would distinguish the nature of the relationship between the Bank and the Plan from the nature of the parties' relationship in Ahrendt. I therefore dismiss the Plan's claim for breach of fiduciary duty.

C.  **Bailment**

The Plan's final claim is that the Bank is liable as a bailee for its failure to safeguard the Plan's funds. The relation between a bank and its depositor, however, is not a bailor-bailee relationship, but a contractual debtor-creditor

13

relationship where title of the funds passes from depositor to bank.  Ahrendt, 144 N.H. at 311 (banks have "debtor-creditor" relationships with depositors); see Dean Witter Reynolds, Inc. v. Variable Annuity Life Ins. Co., 373 F.3d 1100, 1107 (10th Cir. 2004) ("Unlike a bailment, a general deposit passes title to the financial institution, which is required to repay the loan from its own funds upon demand.").  In this case the Plan has not alleged the existence of anything other than a traditional bank-depositor relationship, and the Plan's citations to bailment cases involving banks' night depositories are inapposite.  A bailment claim cannot be sustained on these facts.

## IV.  CONCLUSION

For the foregoing reasons, the Bank's motion to dismiss (Doc. No. 4) is granted.  The clerk is directed to enter judgment accordingly and close the case.

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

January 31, 2012

```
cc:   David W. Rayment, Esq.
      Mark Sutherland Derby, Esq.
      William B. Pribis, Esq.
      David E. Barry, Esq.
      Michele E. Kenney, Esq.
```